Argued October 10, affirmed November 8, 1956

# NEWBERN *v*. EXLEY PRODUCE EXPRESS

303 P. 2d 231

*Nels Peterson* and *Gerald H. Robinson,* Portland, argued the cause for appellant. With Gerald H. Robinson on the briefs were Peterson & Pozzi, and Berkeley Lent, Portland.

*Duane Vergeer,* Portland, argued the cause for respondents. On the brief were Koerner, Young, McColloch & Dezendorf, John Gordon Gearin, and James R. Bjorge, Portland.

TOOZE, J.

This is an action for damages for personal injuries alleged to have been caused by the negligent operation of a motor truck and trailer, brought by Louise Newbern, as plaintiff, against Exley Produce Express, Inc., a corporation, and Dan C. Arnold, impleaded as Dan Claude Arnold, as defendants. Trial was had before the court and jury, and on March 3, 1954, the jury returned a verdict in favor of defendants. On March 8, 1954, judgment was entered in favor of defendants. Plaintiff filed her motion for a new trial, based principally upon the ground of newly discovered evidence,

on April 20, 1954. On May 3, 1954, the trial court denied the motion for a new trial. Plaintiff appeals.

The accident involved in this litigation occurred March 4, 1952, at about noon of said day, on state highway No. 58, in Lane county, Oregon. State highway No. 58 runs in a general easterly and westerly direction between Goshen in Lane county, Oregon, and its juncture with The Dalles-California highway in Klamath county, Oregon, crossing the Cascade mountains on what is generally known as the "Willamette Pass." At the time of the accident and for some distance both easterly and westerly from the point of collision, the surface of the road was covered with packed snow and ice and was very slippery, with snow banked on both sides of the highway. At the place of the accident there was a wide turn-off on the southerly side of the highway, which turn-off is generally known as the Salt Creek Falls turn-off. At this turn-off and off the highway there were at the time two motor trucks of the Oregon state highway commission parked. Although much of the highway had been sanded by the Oregon state highway commission prior to the accident, nevertheless for a considerable distance easterly and westerly of the point of the accident no sand had been placed on the road. About one-fourth of a mile westerly from the point of the collision there is a tunnel through which the highway passes. Although the highway is marked with a center stripe, this stripe at the time had been obliterated by the snow and ice. The highway as it ran between the snow banks was approximately 20 feet in width, with plenty of room for motor vehicles meeting each other to pass in safety.

On March 4, 1952, plaintiff was riding as a passenger in the Buick automobile driven by her husband and was proceeding westerly on said state highway

No. 58. At the same time a motor truck and trailer owned by the defendant Exley Produce Express, Inc., and operated by its employee and agent, defendant Dan C. Arnold, was proceeding in an easterly direction on said highway. A collision between the two vehicles occurred on the southerly side of the road at or near the Salt Creek Falls turn-off, resulting in severe personal injuries to the plaintiff.

Plaintiff in her complaint alleged and upon the trial sought to prove that immediately prior to the happening of the accident the motor truck of the defendant Exley Produce Express, Inc., was being operated on the northerly, or its left, side of the highway. Plaintiff also alleged in her complaint and upon the trial sought to prove that the motor truck made no change in its position on its left side of the highway until immediately after plaintiff's husband had turned the Buick automobile to its left side of the highway toward the Salt Creek Falls turn-off, in order to avoid a head-on collision. Plaintiff also alleged in her complaint and upon the trial sought to prove that immediately after the Buick automobile had been turned toward the left side of the highway, the operator of the motor truck drove his equipment to its own right-hand side of the highway, thereby causing the collision between the two vehicles. On the other hand, the defendants alleged and upon the trial offered evidence to prove that at all times immediately prior to the accident the motor truck and trailer were being operated on their own right-hand side of the highway, and that immediately prior to the collision plaintiff's husband lost control of the Buick automobile in which she was riding, and that it skidded a considerable distance on the ice to its left, or the wrong side of the road, and collided with defendant's truck. From the verdict it is evident that

the jury adopted defendant's version of how the accident happened.

Attached to plaintiff's motion for a new trial and made parts thereof are the affidavits of several persons. The affidavit of R. B. Newbern, plaintiff's husband, stated that after the trial of the cause and on or about March 29, 1954, he had obtained a copy of the report of accident by officer Carl E. Anderson to H. G. Maison, superintendent, department of state police, Salem, Oregon, said report of accident being dated March 4, 1952. He then made a copy of said report a part of his affidavit. Plaintiff claims that this report contradicts the testimony of the defendant Arnold as given on trial of the case with respect to the side of the road upon which he was traveling immediately prior to the accident. We take the following from Anderson's report as set forth in the Newbern affidavit:

"Arnold #2 stated that he had been riding the high side of super so that his trailer would not slide into bank and over if stopped on the packed snow. Upon seeing the car coming down at fairly fast rate of speed he immediately pulled back to his own side of the road and decreased speed. Noted other sliding on super to the left and cut into parking area and was stopped when No. 1 struck front of truck without hardly any decrease of speed."

A counteraffidavit filed by the defendants showed that on April 9, 10, and 11, 1954, plaintiff's husband had caused to be printed in the morning Oregonian of Portland, Oregon, the following advertisement:

"WANTED: Name of party reporting accident between Exley Produce truck and Buick, hiway 58, near Oakridge, Oregon, about noon March 4th, 1952. Write any information to R. B. Newbern, 7908 SW Ruby Terrace, Portland 1, Oregon."

In support of the motion for a new trial plaintiff filed the affidavits of W. Ellsworth Nuser and Inez Nuser, his wife. In his affidavit Nuser stated that he resided at Yakima, Washington; that he is 64 years of age and is married to Inez Nuser, who is the age of 65 years; that they have been married since 1917; that on March 3, 1952, he and his wife were traveling in a westerly direction on state highway 58 in Lane county, Oregon. He was driving a Dodge tudor sedan automobile. He also stated that he was driving his automobile on the north, or right-hand, side of highway No. 58 and was following another car, which was a Buick sedan automobile. Nuser also stated that he was traveling approximately 250 to 300 feet behind the Buick automobile when he saw the collision occur between the Buick and a large tractor type truck and trailer. He also stated that at all times he had a full view of the truck and the Buick automobile before the collision. He said that the Buick automobile was traveling approximately 22 to 25 miles per hour. He also made the following statements:

"* * *. * * * I saw said Buick automobile on the right or northerly half of said highway for approximately 250 feet before the collision occurred. That I also saw the position of said truck for approximately 100 feet before the impact of said vehicles. That when I first saw said truck it was on the same side as said Buick automobile, that is to say, on the northerly or wrong half of the highway, when said truck was heading in the opposite direction. That I saw that the Buick automobile was going to have a head-on collision with said truck unless the driver of the Buick diverted the direction of said Buick automobile. That I saw said Buick automobile turn to the left or south and go onto the wrong half of the highway in order to avoid a head-on collision with said truck. At the same instant I saw the truck also turn to the driver

of the truck's right hand and enter the southerly half of the said highway and the two vehicles met head-on on the southerly half of said highway; that I did not observe the Buick automobile skid nor did I observe the truck skid before the impact occurred.''

Inez Nuser in her affidavit simply adopted the statement of facts contained in the affidavit of her husband as her own statement of what happened at the time and place of the accident. Nuser also stated in his affidavit that he had not been contacted by any person concerning that accident until approximately April 13, 1954. He stated that on or about April 10, 1954, he had seen an advertisement in the newspaper know as ''The Oregonian,'' which he had purchased in Yakima, Washington. He also said that he discussed the witnessing of this accident with his wife, and that on or about April 13, 1954, he called R. B. Newbern in Portland, Oregon, in response to said advertisement and advised him that he and his wife had witnessed the accident, and that thereafter he wrote a letter to Mr. Newbern, and on or about April 14, 1954, met Mr. Newbern personally and recognized him as being the person who was the driver of the Buick automobile which was involved in the accident.

The statements in the affidavit of Mr. Nuser as to how the accident happened corroborated in detail the testimony of R. B. Newbern, plaintiff's husband, given upon the trial of the case and directly contradict the testimony of the defendant Arnold, as well as that of other eyewitnesses to the accident who testified upon the trial as to how the accident happened. One was W. C. Pearce, a disinterested witness, who testified upon the trial that he was driving his automobile in an easterly direction on state highway No. 58 immediately

prior to the accident and was following the defendants' truck and trailer at a distance of approximately 200 yards. He testified that for a distance of 200 yards immediately before the accident the truck was traveling at a rate of speed of approximately ten miles per hour and at all times was being operated on its own right-hand side of the road. He also testified that he first saw the automobile in which plaintiff was riding when it was about 100 yards easterly of the truck and that at the time the Buick automobile was on its own right-hand side of the highway. Elmer R. Callaway, an employee of the state highway commission and the operator of a snowplow which was then parked at the Salt Creek Falls turn-off, testified that he observed the motor truck of the defendants as it came in view around a curve a few hundred feet westerly from the point of collision, and continued to observe it until the impact. He further stated that during the interval of time from when he first saw the truck until the moment of collision, the truck was on its own right-hand side of the highway. As to the accident itself, he testified as follows:

"A Well, the Exley truck was coming up the hill, that is from the west going east, and when the truck come down into the turnaround, it was coming down close to where we was and I turned and looked out the back window of the truck. I seen the Exley— or seen the car coming of course. I didn't know whose car it was, coming down, and all at once it turned to the left and come right down across the road, right in front of the truck."

Donald W. Wood, then an employee of the Oregon state highway commission and the operator of a motor grader then parked on the Salt Creek Falls turnaround, testified that he observed the approach of the motor truck of the defendants toward the point of collision

continuously from the time it came around a curve in the road up to the time and place of the accident. He said that during all that time the motor truck was on its own right-hand side of the highway. He did not see the car in which plaintiff was riding prior to the impact.

From the foregoing statement of the facts it is clearly apparent that there were eyewitnesses who testified upon the trial as to all the material facts in the case. There is nothing new in the affidavits of the Nusers as to the facts and circumstances existing at the time and place of the accident. Instead of discovering new evidence that might shed light upon the facts and circumstances of the case, plaintiff has simply discovered two new witnesses ready to testify and corroborate her version of the facts.

■■ It is hornbook law that applications for a new trial upon the ground of newly discovered evidence are not favored, are viewed with distrust and suspicion, and are construed with great strictness. Such applications are always entertained with reluctance and granted with caution, not only because of the danger of perjury, but also because of the manifest injustice in allowing a party to allege that which may be the consequence of his own neglect in order to defeat an adverse verdict. To prevent, so far as possible, the fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequence of an adverse verdict, an application setting up the discovery of new evidence should always be subjected to the closest scrutiny by the court. Before any court is justified in granting a new trial upon the ground of newly discovered evidence, certain requirements must be met.

In *State v. Davis,* 192 Or 575, 579, 235 P2d 761, we stated:

> "Newly discovered evidence which will justify a court in granting a new trial must meet the following requirements:
>
> > " '(1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as, with due diligence, could not have been discovered before the trial; (4) it must be material to the issue; (5) it must not be merely cumulative; (6) it must not be merely impeaching or contradicting of former evidence. § 5-802 O.C.L.A.' State v. Edison, 191 Or. 588, 232 P.2d 73, 77.
> >
> > " * * * * * *
>
> "A court will not heed the application unless the supporting affidavits show a state of undisputed facts which would probably lead an ordinarily reasonable person to a different conclusion from that arrived at by the jury, other necessary elements being present. Watrous v. Salem Brewery Association, 151 Or. 294, 302, 49 P.2d 375."

See also *Lewis v. Nichols,* 164 Or 555, 570, 103 P2d 284; *Wieder v. Lorenz,* 164 Or 10, 37, 99 P2d 38; *Seaton v. Security Savings Trust Co.,* 131 Or 261, 282 P 556; 39 Am Jur 162, New Trial § 156; 66 CJS 290, New Trial § 101.

■■ As to the report of state police officer Anderson set forth in the affidavit of Mr. Newbern, it is manifest that at most it is impeaching evidence. Moreover, the slightest diligence on the part of plaintiff or her attorneys would have discovered this report long before the trial of the instant case. Its belated discovery by the plaintiff certainly affords no ground for a new trial. As before noted, in the affidavits of the Nusers nothing new is offered in the line of evidence. The

testimony of those witnesses is merely cumulative. There are times, under extraordinary circumstances, when the mere fact that the newly discovered testimony is cumulative will not prevent the allowance of a new trial, but in all such cases it must be made to appear that a manifest injustice has occurred upon the trial of the case. We quote with approval from 39 Am Jur 176, New Trial § 170, as follows:

"As a general rule, a new trial will not be granted on newly discovered evidence when such new evidence is merely cumulative in character. *New evidence which simply adds a few more witnesses to the same question of fact to which others have testified, or which is merely additional proof of a fact already proved, does not warrant a new trial.* This conclusion, it will be observed, is a corollary of the requirement that the newly discovered evidence be such as to render a different result probable on a retrial of the case." (Italics ours.)

■ It is also well established in this state, as well as elsewhere, that the granting or denial of a motion for a new trial rests largely in the sound discretion of the trial court, and that the trial court's decision will not be disturbed upon appeal unless there has been a manifest abuse of discretion. This rule, as adopted and applied in this state, is well set forth in 39 Am Jur 164, New Trial § 157, as follows:

"Power to grant an application for a new trial on the ground of newly discovered evidence is vested in the trial judge to the extent that his ruling thereon may not be made ground for reversal on appeal unless the appellant can establish an abuse of judicial discretion. It is said that the ordering of a new trial rests 'largely' within the discretion of the court. This is true as to criminal cases also. Where the right to a new trial on the ground of newly discovered evidence is statutory, the discre-

tion of the trial court in refusing to grant the application will not be interfered with on appeal, so it is said, unless a 'reasonably clear' case of abuse of discretion is presented.''

See also *Burrows v. Nash,* 199 Or 114, 259 P2d 106; *Hichman v. Bush,* 195 Or 640, 247 P2d 211; *Clark v. Fazio,* 191 Or 522, 230 P2d 553; *Lynn v. Stinnette,* 147 Or 105, 31 P2d 764.

■ Moreover, we cannot determine from the record before us whether the testimony of the Nusers would probably change the result if the new trial were granted. This is wholly a matter of speculation. It is obvious that upon this question the trial judge was in much better position to judge than are we. This trial was held before an able and experienced trial judge who, before his elevation to the bench, had had many years of experience as a successful trial lawyer. In a matter such as that now before us, we would hesitate long before substituting our judgment based upon a cold record for his decision on a matter with which he was personally familiar. In this case we find no abuse of discretion on the part of the trial court in denying the motion for a new trial.

The judgment is affirmed.